125 F.3d 324
 Gregory JOHNSON; Albert P. Owens; Robert Lynn Hill; Eddie
Luellen, Plaintiffs-Appellants,
v.
Kenneth Austin TURNER, Individually and in his capacity as
elected Juvenile Court Judge of Memphis and Shelby County;
Herbert Lane; Michael H. Craig; A.C. Gilless, Individually
and in his capacity as Sheriff of Memphis and Shelby County;
Shelby County Government, a Home-Ruled County Governmental
Entity Operating as a Governmental Municipality; Veronica
Coleman, Individually and in her capacity as Shelby County
Government Attorney-Employee; William Moore; Virginia
Skinner, Individually and in her capacity as Shelby County
Deputy Sheriff in charge of the criminal warrant division,
Shelby County Government; Harold Horne, Individually and in
his capacity as Shelby County Government Attorney-Employee,
Defendants-Appellees,
State of Tennessee, Intervening Defendant-Appellee.
 No. 94-5919.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 16, 1995.
Decided Sept. 8, 1997.
Rehearing and Suggestion for Rehearing En Banc Denied Oct.22, 1997.*
 
 Brett B. Stein, Finley, Stein & Associates, Memphis, TN, Wayne Chastain (argued and briefed), Memphis, TN, for Plaintiffs-Appellants.
 Debra L. Fessenden (argued and briefed), Thomas Edwards Hansom (briefed), Law Offices of Thomas E. Hansom, Memphis, TN, for Defendant-Appellee Kenneth Austin Turner.
 Claudia Swafford Haltom, County Attorney's Office for the County of Shelby, Memphis, TN, Shawn H. Raines (briefed), Shelby County Attorney's Office, Memphis, TN, Charles B. Welch, Jr. (argued and briefed), Farris, Hancock, Gilman, Branan & Hellen, Memphis, TN, for Defendants-Appellees Herbert Lane, Michael H. Craig, Veronica Coleman, William Moore, Harold Horne.
 Shawn H. Raines, Shelby County Attorney's Office, Memphis, TN, Peter M. Brown, Asst. County Attorney, Newton, MA, Charles B. Welch, Jr., Farris, Hancock, Gilman, Branan & Hellen, Memphis, TN, for Defendants-Appellees A.C. Gilless, Virginia Skinner.
 Lisa A. Yacuzzo (argued), Michelle McGriff (briefed), Assistant Attorney General, Civil Division, Nashville, TN, for Intervenor-Appellee State of Tennessee.
 Before: BATCHELDER and MOORE, Circuit Judges; ENSLEN, Chief District Judge*.
 BATCHELDER, J., delivered the opinion of the court, in which ENSLEN, D. J., joined. MOORE, J. (p. 339), delivered a separate opinion concurring in part and dissenting in part.
 OPINION
 BATCHELDER, Circuit Judge.
 
 
 1
 The plaintiffs in these consolidated actions challenge the constitutionality and validity of various Tennessee paternity and child support statutes, as well as the procedures used by Shelby County, Tennessee, and the Shelby County Juvenile Court to enforce those statutes. The complaints name as defendants Shelby County, Tennessee, the county's juvenile court judge, several juvenile court referees, two other juvenile court employees, and the sheriff. The State of Tennessee was permitted to intervene as a defendant. The district court, in a series of rulings, granted judgment to all of the defendants. The plaintiffs appeal.
 
 I. STATEMENT OF THE CASE AND FACTS
 
 2
 At various times in the fall of 1991, these four plaintiffs filed three separate complaints pursuant to 42 U.S.C. § 1983, claiming that the actions of various of the named defendants violated their Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights, and seeking injunctive and declaratory relief as well as damages. The cases were eventually consolidated in the district court. Plaintiffs Gregory Johnson and Albert Owens seek to have the paternity laws under TENN.CODE ANN. §§ 36-2-103 and 36-2-104 declared unconstitutional on their face and as applied. The remaining plaintiffs, Robert Hill and Eddie Luellen, challenge the constitutionality of the child support contempt proceedings under TENN.CODE ANN. §§ 36-5-101(b) and 36-5-405(c).[1]
 
 
 3
 Central to the plaintiffs' complaints are the Shelby County Juvenile Court, its judge and other employees, and its procedures. We begin our discussion there.
 
 A. The Shelby County Juvenile Court
 
 4
 Defendant Kenneth Turner, at all times relevant to this case, was the judge of the Shelby County Juvenile Court. That court's jurisdiction extended to proceedings to establish paternity and to provide for the support and education of children born out of lawful wedlock, to enforce the court's orders in those cases, TENN.CODE ANN. § 37-1-103, and to obtain child support for any minor child in the county, TENN.CODE ANN. § 37-1-104.[2]
 
 
 5
 Judge Turner had statutory authority to appoint referees, TENN.CODE ANN. § 37-1-107(a), who had the powers of a trial judge and the same authority as the juvenile court judge to issue process; the referees' orders became final only after review by the judge. TENN.CODE ANN. §§ 37-1-107, 36-5-402 to -403. Defendants Coleman, Horne, and Lane are duly appointed juvenile court referees.
 
 
 6
 The juvenile court has a chief administrative officer, who is in charge of the administrative operations of the court, including the Child Support Bureau. Judge Turner is responsible for appointing the chief administrative officer and for giving final approval to the hiring of employees of the Child Support Bureau, but he has no hands-on day-to-day involvement with these operations. The clerk of the juvenile court is an elected official, and the court bailiffs are part of the clerk's office. Defendant Moore was an employee of the Child Support Bureau. Defendant Craig was a bailiff of the juvenile court.
 
 B. Plaintiffs Johnson and Owens
 
 7
 The facts surrounding plaintiff Johnson's paternity proceeding are disputed. In his First Amended Complaint, in which plaintiff Owens joined, Johnson claims that on August 28, 1990, he was served with an arrest warrant naming him as the putative father of an illegitimate child. Johnson claims that the warrant was signed, pursuant to TENN.CODE ANN. § 36-2-103(e),[3] by defendant Herbert Lane, a referee of the juvenile court, and the "Officer's Return" indicating execution was signed by defendant Craig, the juvenile court bailiff. According to Johnson, he was taken into custody, and after posting bond, he was released.
 
 
 8
 On the other hand, the defendants contend that Johnson was not arrested on August 28, 1990. Rather, the defendants say that on August 22, 1990, Johnson was served at his place of business with a summons to appear in court on August 28, 1990, for a hearing on a paternity petition. The defendants claim that on the date of the hearing, Johnson appeared at the hearing without having been arrested. A warrant was routinely issued[4] for Johnson on August 28, 1990; he was served that same day when he appeared in court, and the Return was signed by defendant Craig. The defendants say that Johnson appeared before referee Lane, who continued the case upon Johnson's request for blood tests.
 
 
 9
 Plaintiff Owens was issued a notice advising him of a hearing on May 6, 1991, on a paternity petition. When he failed to appear, a warrant was issued pursuant to TENN.CODE ANN. § 36-2-103(e). In late May 1991, sheriff's deputies arrested Owens at his home and informed him that he was wanted on a juvenile court warrant naming him as the father of an illegitimate child. Deputies handcuffed Owens and transported him in a squad car to the Shelby County jail. Owens was held in the jail for several hours before being released on an appearance bond as provided by TENN.CODE ANN. § 36-2-104. He claims that during the time he spent in the "dangerous county jail," he "endured mental and physical pain." He was served with the warrant when he appeared in juvenile court. The Return on the warrant was signed by defendant Moore, an employee of the juvenile court.
 
 
 10
 On September 13, 1991, Johnson and Owens filed an amended 42 U.S.C. § 1983 complaint against the named defendants, challenging the constitutionality, per se and as applied, of two of Tennessee's paternity statutes, TENN.CODE ANN. §§ 36-2-103(e) and 36-2-104.[5] The plaintiffs allege that TENN.CODE ANN. § 36-2-103 violates the Fourth Amendment because it authorizes arrests in purely civil matters without a showing of effective service of process and a finding of probable cause supported by oath or affirmation. They also allege that they have been deprived of their right to have their cases heard by a neutral and detached judge, because the statute permits the same judicial officer who issues a warrant to preside at the paternity hearing. Finally, they allege that TENN.CODE ANN. § 36-2-104 violates the Due Process Clause of the Fourteenth Amendment because it authorizes prejudgment seizure of a putative father's assets before a final judgment as to paternity has been entered. Johnson and Owens filed a motion for class action certification in which they sought to represent a class defined as all putative fathers who have been, or who will be, arrested and detained pursuant to the challenged statutes.
 
 C. Plaintiff Hill
 
 11
 Plaintiff Hill entered into one consent order in 1982 regarding the support of his child with Renee D. Hill, and another in 1986 regarding his child with Mandy McClain. A Petition for Citation for Contempt of Court was prayed for in the McClain case and a summons for contempt was issued on June 6, 1989. When the summons was returned with the notation that Hill could not be found within the county, an order for attachment pro corpus stamped with defendant Judge Turner's facsimile signature was entered, and an attachment pro corpus, signed by defendant Veronica Coleman in her capacity as a juvenile court referee, was issued on July 12, 1989, pursuant to TENN.CODE ANN. §§ 36-5-101(b)[6] and 36-5-405(c).[7] Neither the order nor the attachment was supported by oath or affirmation, nor did the document contain any facts stating the basis for the issuance of the attachment.
 
 
 12
 In the mid-1980s, Hill had filed a civil rights lawsuit against Turner, Shelby County, and others, alleging many of the same constitutional violations as he alleges here, but based on the criminal non-support proceedings under the then-existing TENN.CODE ANN. § 39-4-102 (repealed 1989). That suit was settled by a consent decree on October 22, 1990, under the terms of which Turner agreed to stop arresting parents without probable cause, and to stop having parents tried by the same judicial officer who had originally signed the warrants or attachments pro corpus for their detention and arrest.
 
 
 13
 While Hill's first action against Judge Turner was in settlement negotiations, the juvenile court issued a show cause petition against Hill for failure to make child support payments for his child with Renee D. Hill as required by the 1982 Consent Order. On November 2, 1990, Hill appeared with counsel before Referee Coleman. Hill explained that he had fallen behind in his child support payments because he had recently undergone surgery that left him unable to work, and presented evidence that he would soon receive a $5,000 settlement check from the county that could help reduce the arrearage in his child support payments. The referee found that Hill was not in contempt and recommended that the contempt petition be dismissed and that Hill be required to pay a weekly sum toward his child support obligation and costs.
 
 
 14
 The next morning (a Saturday), November 3, 1990, Memphis police arrested Hill on the year-old attachment pro corpus in the McClain case. Police took Hill to the county jail, where he remained until the following Monday afternoon, when he was brought before the juvenile court. At that time, Coleman found that Hill was not in contempt and recommended that the year-old contempt petition be dismissed and that Hill be required to pay a weekly sum on his arrearage and costs. Coleman ordered Hill's immediate release from jail. Hill, however, was returned to the county jail, where he was held for two more days until Coleman's findings and recommendations, which were adopted by Judge Turner as the decree of the court,[8] were provided to the jail as the written order for Hill's release.
 
 
 15
 Hill seeks monetary as well as declaratory and injunctive relief in his amended complaint brought pursuant to 42 U.S.C. § 1983, claiming violations of his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Hill alleges unlawful arrest, detention, and prolonged incarceration, all arising out of the attachment pro corpus signed by Coleman. He challenges TENN.CODE ANN. §§ 36-5-101(b) and 36-5-405(c), arguing that the statutes are unconstitutional per se and unconstitutional as applied by defendant Turner and his judicial referees. As with the Johnson/Owen suit, Hill contends that the attachment statutes are unconstitutional because they do not require a finding of probable cause before an attachment pro corpus is issued against a father who has fallen behind in his child support payments. Although it is far from clear, Hill apparently claims that the attachment statutes violate the Fourth Amendment, because they authorize arrest in contempt proceedings in the absence of an oath or affirmation that would support a probable cause finding that (1) the named parties are guilty of any criminal activity, or (2) service was not achieved. Hill further argues that he was denied adequate notice and opportunity to be heard prior to arrest.
 
 
 16
 Hill also claims that the statutes are unconstitutionally applied by defendants when they operate to deprive him of fair hearings before a fair forum presided over by neutral and detached judicial officers, because they permit the same judicial officer who issues the attachment pro corpus to preside at the contempt hearings. Although the attachment pro corpus signed by Judge Turner was issued in 1989, Hill relies on the 1990 consent decree to support his position that the defendants knew that their conduct was unconstitutional.[9]
 
 
 17
 Hill moved to be certified as the representative of a class of mothers and fathers who have been, or who will be, arrested pursuant to TENN.CODE ANN. §§ 36-5-101(b) and 36-5-405(c), the attachment statutes, without having first received legal notice through effective service of process.
 
 D. Plaintiff Luellen
 
 18
 Plaintiff Luellen was recovering at home from an illness in mid-November 1990, when he was arrested and taken to the Shelby County jail by two deputies, acting on an outstanding warrant from the juvenile court. The juvenile court records reveal that some six months before Luellen's arrest, a summons on a contempt petition had been issued and returned with the notation that Luellen could not be found in the county, and referee Coleman had issued an attachment pro corpus. Luellen was arraigned before defendant Harold Horne, in his capacity as juvenile court referee. Horne asked Luellen why he was delinquent in his payment of child support and Luellen responded that he had been unemployed. Horne provided Luellen with three pages of "job sheets" and ordered Luellen to return to court within a month's time, admonishing him that, when he returned, he had better have "the sheets filled with signatures of prospective employers [with] whom he had interviewed for jobs."
 
 
 19
 When Luellen returned to juvenile court, he had filled only a page and half of the job sheets. Pressed by Horne to explain, Luellen said that because there were not many jobs available where he lived (the "inner city"), and because he did not have transportation, and because having to ask prospective employers to fill out the sheets nixed his chances of getting several of the jobs he had interviewed for, he could not obtain more signatures. Horne responded that Luellen would be tried for contempt; appointing an attorney who was present in the courtroom to represent Luellen in the contempt proceedings, Horne found Luellen guilty on the spot, and sentenced him to five days in the county jail. Additionally, Horne ordered that before Luellen was released from the jail, he should be returned to Horne's courtroom to collect five more job sheets to be filled out within a month's time, admonishing him that unless each sheet was entirely filled, Luellen would be sentenced to five more days of jail time and the process would continue until he was fully employed. When asked if he had anything to say, Luellen responded that Horne "might as well give him a life sentence right then, because if he had such a difficult time filling a page and a half, there was no way he could legitimately fill out five pages during this period of time." Horne promptly modified his previous order and imposed a six-month sentence in the Shelby County Penal Farm.
 
 
 20
 After being incarcerated for some twenty-two days, apparently without even an entry ordering incarceration, Luellen filed for a writ of habeas corpus in the Shelby County criminal court. A criminal court judge released Luellen on his own recognizance pending an evidentiary hearing. At the evidentiary hearing, the county did not oppose the petition, and the criminal court judge granted Luellen habeas corpus relief.
 
 
 21
 Luellen then filed this § 1983 action, alleging that his arrest and detention authorized under the attachment pro corpus issued by Coleman, as well as the six-month sentence for contempt, violated his Fourth, Fifth, Sixth, and Fourteenth Amendment rights. Like plaintiff Hill, Luellen challenges the constitutionality of the attachment statutes. In addition, Luellen claims that he was entitled to be advised of his constitutional rights before being tried for criminal contempt; that he was not provided with adequate notice that he would be subjected to a criminal contempt hearing; that he was not provided with effective assistance of counsel; and that in contempt proceedings, a judicial officer, i.e., defendant Horne, may not act as a prosecutor and judge and must, therefore, recuse himself when changing a contempt proceeding from a civil to a criminal proceeding. Luellen moved to certify a class action comprising all similarly-situated males who had been subjected to the allegedly unconstitutional practices employed by the defendants in this case.
 
 E. District Court's Disposition
 
 22
 In a series of orders, the district court disposed of all of the claims in these actions. First, the court noted that the parties had agreed during oral argument that Johnson was not incarcerated on the date alleged; the court therefore dismissed plaintiff Johnson's claims as time-barred. The court granted summary judgment to defendants Turner and the juvenile court referees and employees,[10] holding that they were entitled to judicial immunity from the declaratory and injunctive relief sought by the plaintiffs because the plaintiffs "failed to set out those facts which would demonstrate that the Tennessee appellate courts are unwilling to correct constitutional errors in the juvenile court proceedings." The court further held that Turner and the juvenile court referees and employees were entitled to judicial immunity on the claims for monetary relief because the record demonstrated that they had neither acted in the clear absence of all jurisdiction nor engaged in non-judicial acts. The court also denied plaintiffs' motions for class certification and granted summary judgment to Shelby County, finding, inter alia, that the county could not be held responsible for either the training of the juvenile judge and the referees and employees of the juvenile court or for the judicial decisions rendered by that court. Finally, the district court held, based upon our decisions in Sevier v. Turner, 742 F.2d 262 (6th Cir.1984), and Parker v. Turner, 626 F.2d 1 (6th Cir.1980), that it would abstain from passing on the underlying merits of plaintiffs' respective challenges to the constitutionality of the various statutes on the theory of abstention set forth initially in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).
 
 
 23
 The plaintiffs timely appealed the district court's final judgment. On appeal, plaintiffs attempt to restore their suit to its full confusing vigor, asking us to undo the district court's adverse rulings. We first review the district court's finding that plaintiff Johnson's claims were time-barred. Next, we address the numerous issues before us in connection with the plaintiffs' claims for monetary relief against the named defendant(s). Finally, we conclude by examining the plaintiffs' claims for injunctive and declaratory relief.
 
 II. ANALYSIS
 A. Standard Of Review
 
 24
 We review a district court's grant of summary judgment de novo. Terry Barr Sales Agency, Inc. v. All-Lock Co., 96 F.3d 174, 178 (6th Cir.1996); Klepper v. First American Bank, 916 F.2d 337, 341 (6th Cir.1990). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); Terry Barr Sales Agency, Inc., 96 F.3d at 178. The burden is on the moving party to establish conclusively the nonexistence of any genuine issue of material fact. Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir.1987). However, all factual inferences must be viewed in the light most favorable to the non-movant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
 
 B. Johnson's Claim As Time-Barred
 
 25
 The district court found from stipulated facts that Johnson was not incarcerated on August 28, 1990. Hence, the court concluded that Johnson's claim was barred by the one-year statute of limitations applicable in Tennessee. See TENN.CODE ANN. § 28-3-104(a)(1), (3). On appeal, Johnson relies on the signed and executed warrant to establish error in the district court's dismissal of his claims.
 
 
 26
 The record clearly indicates that Johnson received notice, voluntarily appeared, and was not incarcerated on August 28, 1990, as he alleges. However, it is also clear that a warrant for his arrest was issued and served upon him on August 28, 1990, when he voluntarily appeared for the paternity hearing. Johnson filed his complaint on August 26, 1991, within a year after he was ordered into court under the statute he challenges. Because Johnson was served with a warrant and subjected to a bond pursuant to the statutes he seeks to challenge, within a year of bringing this suit, we conclude that his claim is not time-barred under the one-year statute of limitations applicable in Tennessee.
 
 
 27
 C. Monetary Damages Against Judicial Officers
 
 
 28
 The plaintiffs contend that Judge Turner and the juvenile court referees and employees are liable for money damages because they acted beyond their jurisdiction and acted in a non-judicial, prosecutorial manner. A judge performing his judicial functions is absolutely immune from suit seeking monetary damages. Mireles v. Waco, 502 U.S. 9, 9-10, 112 S.Ct. 286, 286-87, 116 L.Ed.2d 9 (1991) (per curiam); Mann v. Conlin, 22 F.3d 100, 103 (6th Cir.1994). Judicial immunity is available to judges presiding over courts of both general and limited jurisdiction. King v. Love, 766 F.2d 962, 966 (6th Cir.1985). Immunity is available even if a judge acts erroneously, corruptly, or in excess of his jurisdiction. Mireles, 502 U.S. at 11-12, 112 S.Ct. at 287-88; King, 766 F.2d at 965. One who acts as the judge's designee, and who carries out a function for which the judge is immune, is likewise protected. Bush v. Rauch, 38 F.3d 842, 847 (6th Cir.1994) (holding that court executive who executes court order is entitled to judicial immunity); Foster v. Walsh, 864 F.2d 416, 417 (6th Cir.1988) (holding that court clerk was entitled to judicial immunity for issuing erroneous warrant on judge's order).
 
 
 29
 A judge, however, will not be immune from suit seeking monetary damages in two circumstances: (1) where the judge acts in a non-judicial capacity; or (2) where the judge acts in the complete absence of all jurisdiction. Mireles, 502 U.S. at 11-12, 112 S.Ct. at 287-88; Mann, 22 F.3d at 103.
 
 
 30
 1. "Non-judicial acts" exception.
 
 
 31
 In determining whether an act is judicial we examine "the 'nature' and 'function' of the act, not the 'act' itself." Mireles, 502 U.S. at 13, 112 S.Ct. at 288-89 (quoting Stump v. Sparkman, 435 U.S. 349, 362, 98 S.Ct. 1099, 1107, 55 L.Ed.2d 331 (1978)); Barnes v. Winchell, 105 F.3d 1111, 1116 (6th Cir.1997). "[E]ven if a particular act is not a function normally performed by a judge, we are directed to 'look to the particular act's relation to a general function normally performed by a judge.' " Barnes, 105 F.3d at 1116 (quoting Mireles, 502 U.S. at 13, 112 S.Ct. at 288); see, e.g., Mireles, 502 U.S. at 12-13, 112 S.Ct. at 288-89 (examining the "nature" and "function" of act, rather than "act itself," the Court concluded that the judge, although in error or in excess of authority, nonetheless, acted within judicial function by directing police officers to bring attorney to court forcibly and with excessive force); King, 766 F.2d at 965-68 (holding that although the judge exceeded his authority, he had jurisdiction to incarcerate party for contempt of court and was therefore immune).
 
 
 32
 Thus, for example, a judge may be liable for action taken in his role as employer, Forrester v. White, 484 U.S. 219, 227-30, 108 S.Ct. 538, 544-46, 98 L.Ed.2d 555 (1988) (demotion and discharge of court employee is an administrative decision and not "a judicial act"), or for an action that is administrative in nature and that does not alter the rights and liabilities of the parties, Morrison v. Lipscomb, 877 F.2d 463, 464-66 (6th Cir.1989). This court also has held that the initiation of accusatory processes, such as criminal prosecutions or civil contempt proceedings, is a non-judicial act that may subject a judge to liability. Sevier v. Turner, 742 F.2d 262, 272 (6th Cir.1984). However, recently, in Barnes, we explained that the exception to absolute immunity, when a judge engages in a purely prosecutorial function, is a narrow one; and, even if the judge encroaches upon prosecutorial functions, the broad shield of absolute immunity is not automatically overcome. 105 F.3d at 1118-119.
 
 
 33
 We apply the foregoing principles to the plaintiffs' contention that defendant Turner and the juvenile court referees engaged in non-judicial acts.[11] The plaintiffs contend that the district court erred in granting Turner judicial immunity because some of the juvenile court's employees under Turner's supervision initiated criminal and civil contempt proceedings on behalf of the Child Support Bureau. In essence, plaintiffs assert that Judge Turner's involvement in the process of hiring Child Support Bureau personnel and his appointment of the Bureau's Chief Administrative Officer, with whom he has "coexistent" authority over personnel matters, places the judge in the position of overseeing the "initiation of accusatory proceedings," which is a prosecutorial and not a judicial function, and he, therefore, is not entitled to judicial immunity.
 
 
 34
 As noted, undertaking purely prosecutorial duties by initiating accusatory process, if proven, might very well subject Turner to liability. See Barnes, 105 F.3d at 1118; Sevier, 742 F.2d at 272. In Sevier, we held that because the initiating of criminal prosecutions and civil contempt proceedings is not a function normally performed by a judicial officer, such actions are non-judicial and would expose the judicial officer, Judge Turner, to liability.[12] 742 F.2d at 272. However, in that case, defendant Judge Turner was responsible for collecting overdue child support payments. Id. In order to discharge that responsibility, Turner allegedly instructed his staff members "to initiate criminal prosecutions against fathers who [were] in arrears on their payments." Id. Furthermore, with the aid of a referee, Judge Turner initiated civil contempt proceedings against those fathers who did not remain current on the payments required by consent orders. Id. Significantly, Judge Turner received part of his salary from payments collected. Id.
 
 
 35
 The facts of this case are clearly distinguishable from those of Sevier. In the case before us, the uncontradicted evidence demonstrates that Judge Turner does not initiate paternity or contempt actions; he does not preside over the initial hearings in those cases; he is unaware of the specific individual actions and he neither participates in the process whereby those actions are initiated nor follows those actions; and his only involvement in those actions is that of a judicial officer called upon to issue an order or render a decision based on the record before him. Furthermore, Judge Turner is involved only with the remote and final approval of appointment of personnel for the Child Support Bureau and is not involved with the day-to-day operations of the Bureau. Judge Turner's remote and final approval of the selection and/or appointment of personnel to the Child Support Bureau, without more, is insufficient to create a genuine issue of material fact as to whether Turner was engaged in non-judicial acts. Having concluded that Judge Turner did not engage in non-judicial acts, we next examine whether the defendants acted in the clear absence of all jurisdiction.
 
 
 36
 2. "Clear absence of all jurisdiction" exception.
 
 
 37
 A judge acts in the clear absence of all jurisdiction only when the matter upon which he acts is clearly outside the subject matter of the court over which he presides. Upon a careful review of the record, we find that none of the actions taken by the judicial officers was taken in the "clear absence of all jurisdiction." Assuming, as the plaintiffs suggest, that the judicial officers were guilty of grave procedural errors associated with either the issuance of warrants and attachments pro corpus or the contempt proceedings, their mistakes do not render them liable for damages.
 
 
 38
 Judge Turner and the juvenile court referees acted within the scope of their statutory functions in seeking orders of attachment to set and enforce child support and in conducting the various hearings. These judicial officers were clearly performing their statutory duty to establish paternity and enforce child support payments in a manner that was specifically authorized by statute. Specifically, defendants Turner and Coleman were acting within the scope of their statutory authority, which arguably does not require that any sworn oath or affidavit of complaint appear as a part of the petition for citation of contempt. Similarly, although Horne may have exceeded his authority by imposing a six-month jail term for contempt against Luellen, Horne was acting within the scope of his authority to hold contempt hearings and to punish contempt. The defendants' actions were within their jurisdiction and can only be described as an integral part of the judicial process in the establishment and enforcement of court orders concerning child support payments. Even assuming the plaintiffs' allegations to be true, there can be no question that Judge Turner and the judicial referees were empowered to handle juvenile court cases and were not acting in a clear absence of all jurisdiction.
 
 
 39
 The district court's grant of summary judgment in favor of Judge Turner and the judicial referees and employees on plaintiffs' claims for monetary relief is affirmed.
 
 D. Monetary Damages Against The County
 
 40
 The plaintiffs contend that defendant Turner is a local official with final policy-making authority to interpret and apply the statutes challenged here. Hence, they argue that because Turner is either interpreting and applying constitutionally flawed statutes, or interpreting and applying constitutionally adequate statutes in a constitutionally flawed manner, his actions are attributed to the county, which, in turn, is subject to § 1983 liability. We are not persuaded by the plaintiffs' theory.
 
 
 41
 It is well-established that a local government official with final policy-making authority under state law may, by his actions, subject the local government for which he works to § 1983 liability. See City of St. Louis v. Praprotnik, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988); Pembaur v. City of Cincinnati, 475 U.S. 469, 483, 106 S.Ct. 1292, 1299-300, 89 L.Ed.2d 452 (1986) (finding the county responsible for actions taken pursuant to decisions of county prosecutor and county sheriff); Feliciano v. City of Cleveland, 988 F.2d 649, 655 (6th Cir.1993) (city police chief did not exercise final policy-making authority regarding drug testing of police officers). However, the plaintiff must " 'identify the policy, connect the policy to the [county] itself and show that the particular injury was incurred because of the execution of that policy.' " Garner v. Memphis Police Dep't, 8 F.3d 358, 364 (6th Cir.1993) (quoting Coogan v. Wixom, 820 F.2d 170, 176 (6th Cir.1987)); see also Monell v. Dep't of Social Services of City of New York, 436 U.S. 658, 694-95, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978).
 
 
 42
 Although it is less than clear, the plaintiffs apparently identify a memorandum issued by Judge Turner on December 4, 1990, as the alleged policy that subjects the county to liability:
 
 
 43
 When a respondent is summoned to Court in a proceeding to establish child support and fails to answer the summons, the Court may take a default judgment. If officers are unable to locate him for service of summons, the Court will order that an Attachment Pro Corpus issue to take the person into custody and bring him or her before the Court in accordance with Tennessee Annotated Section 37-1-122.
 
 
 44
 This memorandum was sent to the referees, the clerk of the court, and the Chief Administrative Officer. All parties agree that this is, in general terms, the process by which an attachment pro corpus is issued through the juvenile court. The district court properly concluded that Judge Turner's memorandum that discusses the initiation of the attachment pro corpus is not a "policy" for the Child Support Bureau, but rather a general restatement of state law as perceived by the juvenile court judge. Further, the alleged unconstitutional actions taken by the juvenile court judge are not "policies" of the county for which liability could attach under Monell, 436 U.S. at 694-95, 98 S.Ct. at 2037-38, but are judicial decisions reviewable on appeal to the Tennessee appellate courts. The functions of the juvenile court are established by state law. The Shelby County government could not have altered the state statutes, nor could it have required Judge Turner to interpret those statutes differently or otherwise interfered with the means used by the juvenile court and its employees to carry out state law. We affirm the district court's grant of summary judgment in favor of Shelby County.
 
 E. Declaratory And Injunctive Relief
 
 45
 Finally, we consider the plaintiffs' claim for injunctive and declaratory relief. Specifically, Johnson and Owens seek to have the court declare unconstitutional the paternity statutes under which they were arrested, subjected to seizure and/or detention, and subsequently adjudicated as the natural fathers of the children for whose support they are now responsible. They seek also to enjoin the state from taking any action pursuant to the paternity statutes. Hill seeks a declaration that the statutes authorizing issuance of writs of attachment for parents delinquent in child support payments, which resulted in his arrest, seizure, and detention without a finding of probable cause, are unconstitutional. Both Hill and Luellen seek injunctive relief against the defendants for their alleged unconstitutional practices in the contempt proceedings.
 
 
 46
 It is well-settled that while a plaintiff who has suffered a violation of his constitutional rights may bring a § 1983 action to recover damages, that same plaintiff may not maintain an action for declaratory or injunctive relief unless he can demonstrate standing to seek such relief. City of Los Angeles v. Lyons, 461 U.S. 95, 107-109, 103 S.Ct. 1660, 1668-69, 75 L.Ed.2d 675 (1983) (finding that although the plaintiff allegedly had suffered actual harm and could presumably recover damages under § 1983, he could not demonstrate a case or controversy with the defendant that would justify the equitable relief sought because standing to seek the injunction requested depended on whether he was likely to suffer future injury); cf. Golden v. Zwickler, 394 U.S. 103, 109-10, 89 S.Ct. 956, 960-61, 22 L.Ed.2d 113 (1969) (holding that declaratory judgment action seeking to invalidate state statute as unconstitutional must be dismissed because, although plaintiff had been prosecuted under the statute, the chance of plaintiff's repeat exposure to the statute was remote and thus plaintiff lacked standing).
 
 
 47
 Although the district court did not address the standing of the plaintiffs, we are obliged to determine whether the plaintiffs had standing to seek injunctive and declaratory relief in the district court[13] or now have standing to pursue this appeal.[14] We hold that they do not.
 
 
 48
 Article III, section 2 of the United States Constitution confines federal court jurisdiction to "cases" and "controversies." Arizonans for Official English v. Arizona, 520 U.S. 43, ----, 117 S.Ct. 1055, 1067, 137 L.Ed.2d 170 (1997). The case-or-controversy requirements of Article III, however, are not satisfied merely because a party asks a federal court to declare his legal rights. Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471, 102 S.Ct. 752, 757-58, 70 L.Ed.2d 700 (1982). These requirements have been construed to prohibit such advisory opinions. See SEC v. Medical Committee for Human Rights, 404 U.S. 403, 407, 92 S.Ct. 577, 579-80, 30 L.Ed.2d 560 (1972). Indeed, a federal court has no jurisdiction to hear a case that cannot affect the litigants' rights. Valley Forge, 454 U.S. at 471, 102 S.Ct. at 757-58. As the Supreme Court explained in Valley Forge:
 
 
 49
 The judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or executive acts. The power to declare the rights of individuals and to measure the authority of governments, this Court said 90 years ago, "is legitimate only in the last resort, and as a necessity in the determination of real, earnest, and vital controversy." Otherwise the power "is not judicial ... in the sense in which judicial power is granted by the Constitution to the courts of the United States."
 
 
 50
 As an incident to the elaboration of this bedrock requirement, this Court has always required that a litigant have "standing" to challenge the action sought to be adjudicated in the lawsuit.
 
 
 51
 Id. (internal citations omitted).
 
 
 52
 Examination of the standing issue involves two levels of inquiry. The first is whether the plaintiff has shown, "at an irreducible minimum," some actual or threatened injury resulting from the putatively illegal action. Id. at 472, 102 S.Ct. at 758-59. The second inquiry involves considering whether, as a prudential matter, the plaintiff is the proper proponent of the rights on which the action is based. Singleton v. Wulff, 428 U.S. 106, 112-13, 96 S.Ct. 2868, 2873-74, 49 L.Ed.2d 826 (1976).
 
 
 53
 To satisfy the "injury" requirement of the first level of constitutional inquiry, it is not enough for the plaintiff to assert some abstract injury. It must be demonstrated that the plaintiff " 'has sustained or is immediately in danger of sustaining some direct injury' " as a result of the challenged statute or official conduct. Valley Forge, 454 U.S. at 476-78, 102 S.Ct. at 760-61 (quoting Frothingham v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923)). The injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical." O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974).
 
 
 54
 Within the context of declaratory relief, the Supreme Court has held that when the threat of prosecution is apparent, a litigant need not first expose himself to actual arrest or prosecution to be entitled to challenge the constitutionality of a statute. See Steffel v. Thompson, 415 U.S. 452, 459, 94 S.Ct. 1209, 1215-16, 39 L.Ed.2d 505 (1974). The Court further stated in Babbitt v. United Farm Workers National Union, 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979), that when a plaintiff "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.' " Id. at 298, 99 S.Ct. at 2309 (quoting Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973)).
 
 
 55
 At the time the various actions now before us on appeal were commenced, the judgments in plaintiffs' state court contempt and paternity proceedings were final. Johnson and Owens, pursuant to the paternity statutes and procedures they now challenge, had been adjudicated the natural fathers of their respective children, neither had raised in those proceedings any challenge to the constitutionality of the statutes or proceedings, and neither had brought any appeal. Similarly, Hill and Luellen were imprisoned pursuant to the contempt orders but had been released prior to their initiation of this action. Indeed, both of Hill's contempt proceedings had been dismissed, and Luellen had challenged the contempt order pursuant to which he was imprisoned and obtained habeas corpus relief.
 
 
 56
 In sum, at the time they filed these federal actions, none of the plaintiffs was incarcerated or involved in a pending paternity, support or contempt proceeding, and any constitutional challenges associated with the state court orders and proceedings are, therefore, moot. See, e.g., Juidice v. Vail, 430 U.S. 327, 332, 97 S.Ct. 1211, 1215-16, 51 L.Ed.2d 376 (1977). Those terminated state court actions cannot provide the requisite live case or controversy to confer upon these plaintiffs standing to challenge the constitutionality of the contempt and paternity procedures or statutes. The plaintiffs might have avoided this result had they alleged a continuing, present adverse effect as a result of the state juvenile court paternity and support proceedings and judgments. O'Shea, 414 U.S. at 495-96, 94 S.Ct. at 675-76 (holding that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects"); see also Carafas v. LaVallee, 391 U.S. 234, 237, 88 S.Ct. 1556, 1559, 20 L.Ed.2d 554 (1968). The plaintiffs have not identified any continuing, present adverse consequences flowing from their having been subject to the paternity and contempt orders and the arrest warrants.
 
 
 57
 In the absence of a continuing adverse effect or a pending litigation, the plaintiffs, in order to have standing to maintain this equitable action, must show that they are now subject to a genuine threat of prosecution. O'Shea, 414 U.S. at 496-98, 94 S.Ct. at 676-77; Babbitt, 442 U.S. at 298-99, 99 S.Ct. at 2308-09; Juidice, 430 U.S. at 332-33, 97 S.Ct. at 1215-16. Plaintiffs also can attack the Tennessee statutes or procedures if they are able to establish that the particular challenged rule sufficiently impedes their future action. See Clements v. Fashing, 457 U.S. 957, 962, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982); Babbitt, 442 U.S. at 298-99, 99 S.Ct. at 2308-09. Plaintiffs Johnson and Owens have failed to demonstrate that they meet this requirement because for them this was a one-shot case. They have neither pled nor alluded to any other paternity petition that has been either threatened or filed or any outstanding arrest warrant or attachment. They have provided no evidence that they have been threatened with further or repeated proceedings. Without any evidence that they will again be subject to Tennessee's paternity proceedings, plaintiffs Johnson and Owens are left with no interest in the challenged statutes and proceedings greater than that of any other male in Tennessee. Accordingly, Johnson and Owens' declaratory and injunction claims must be dismissed.
 
 
 58
 Likewise, Hill and Luellen do not allege the likelihood, or even the possibility, that they will be subject to future contempt orders. This court's decision in Parker v. Turner, 626 F.2d 1, 5 & n. 11 (1980), clearly established the burden that plaintiffs such as Hill and Luellen are required to meet in order to have standing to request injunctive and declaratory relief. Exactly like the present case, Parker involved fathers who were under state court orders to pay alimony and child support. The Parker plaintiffs brought an action claiming that state juvenile court judges routinely denied them basic due process rights in civil contempt proceedings. Id. 626 F.2d at 2. The plaintiffs complained that the juvenile court judges in Memphis routinely jailed fathers who owed support money without allowing them an opportunity to defend themselves; they requested that the district court grant declaratory and injunctive relief to stop the alleged unconstitutional practices. Id. The Parker plaintiffs alleged that they could not afford to make support payments and thus were likely to face future contempt proceedings. We held that "the plaintiffs' specific allegations of poverty and past jailing for non-support are sufficient to create an actual case or controversy." Id. 626 F.2d at 5 n. 11.
 
 
 59
 Unlike the plaintiffs in Parker, neither Hill nor Luellen alleged any facts indicating that he will not be able to afford to make support payments and is therefore likely to face future contempt proceedings. In fact, the record demonstrates that Hill was expecting a settlement award which he claimed would enable him to pay his child support. The record also shows that Luellen was unemployed at the time of his state contempt proceedings. However, Luellen has not alleged that he has remained unemployed or that he will not be able to afford to make support payments. He has wholly failed to provide any specific facts showing that he might face contempt proceedings again. As these plaintiffs did not allege, and as the district court did not find, that they are threatened with further or repeated contempt proceedings, they do not have the necessary standing to seek injunctive and declaratory relief. See Juidice, 430 U.S. at 332-333, 97 S.Ct. at 1216. Accordingly, Hill's and Luellen's claims for declaratory and injunctive relief are also dismissed.
 
 F. Class Certification
 
 60
 The claims of all of the plaintiffs having been dismissed, the issue of class certification is rendered moot.
 
 III. CONCLUSION
 
 61
 For the reasons stated herein, we AFFIRM the judgments of the district court.
 
 
 62
 MOORE, Circuit Judge, concurring in part and dissenting in part.
 
 
 63
 Plaintiffs raise serious constitutional questions regarding the challenged paternity and child support procedures followed by the Juvenile Court of Memphis and Shelby County. Various procedures of the juvenile court have produced constitutional challenges for almost two decades. See Parker v. Turner, 626 F.2d 1 (6th Cir.1980); Sevier v. Turner, 742 F.2d 262 (6th Cir.1984). I agree with the majority, however, that this court cannot reach the merits of most of these challenges because of problems of the plaintiffs' standing to raise claims for injunctive and declaratory relief and because of defendant judicial officers' absolute judicial immunity with regard to the monetary damages claims.
 
 
 64
 With respect to plaintiff Owens's monetary claims against Shelby County, I part company from the majority. At a minimum plaintiff Owens claims that he was arrested and jailed on a warrant that simply claimed he was a parent, in other words a warrant that lacked any indicia of probable cause. This appears to be the usual practice followed in such cases, according to the evidence in the record before us. At this stage of the litigation, I cannot agree with the majority that summary judgment for the county on this claim is appropriate. Under Monell v. Dep't of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and Pembaur v. Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), I believe that a sufficient showing has been made that this practice of obtaining arrest warrants without any showing of probable cause that a criminal offense has been committed constitutes official municipal policy, so that Shelby County's motion for summary judgment should have been denied. Therefore I dissent from Part II. D. of the majority opinion.
 
 
 
 *
 Judge Moore would grant rehearing for the reasons stated in her dissent
 
 
 *
 The Honorable Richard A. Enslen, Chief United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 Several of the Tennessee statutes cited herein have been subsequently amended; those amendments are not relevant to this action
 
 
 [2]
 Pursuant to the provisions of Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, and various provisions of Titles 36 and 71 of the Tennessee Code, the Juvenile Court had a contract with the Tennessee Department of Human Services, whereby the court provided child support services through the court's Child Support Bureau. As the Title IV-D contract agency, the court also had jurisdiction over child support proceedings. TENN CODE ANN. § 37-1-104
 
 
 [3]
 TENN.CODE ANN. § 36-2-103(e) provides:
 The [juvenile] court shall issue a warrant for the apprehension of the defendant [a putative father who is the subject of a petition to establish paternity], directed to any officer in the state authorized to execute warrants, commanding such officer without delay to apprehend the alleged father and bring him before the court, for the purposes of having an adjudication as to the paternity of the child, and such warrant may be issued to any county of this state. But in the discretion of the court, a summons may be issued as in civil cases.
 
 
 [4]
 The procedure routinely followed in Shelby County for paternity cases was as follows: After a Petition to Establish Paternity was filed, the putative father would be notified of a date and time for the hearing through either a notice and/or summons. The warrants were issued, pursuant to TENN.CODE ANN. § 36-2-103(e), on the date of the hearing, regardless of whether the putative father appeared. If the putative father appeared, the warrant was served and placed in the file jacket as proof of service and there would be no physical arrest or transport to the jail. If, however, he did not appear, a warrant would issue for his arrest
 
 
 [5]
 TENN.CODE ANN. § 36-2-104 provides:
 (a) When the defendant is arrested he shall be taken before the court issuing the warrant.
 (b) The court shall take an appearance bond from the defendant in an amount not less than five hundred dollars ($500) to secure his appearance in court or may, in its discretion, take from the defendant a bond in an amount not less than five hundred dollars ($500) to secure his appearance in court and to indemnify the petitioner against any expense for the support and education of the child or for the support of the mother during her confinement and recovery and to secure payment of any order of support. Such bond shall be with surety in the form of commercial or personal security approved by the court or cash or negotiable obligations of the federal government as collateral.
 (c) If the defendant does not make bond as provided in subsection (b), the court may commit him to jail to be held to answer the complaint.
 (d) If the defendant requests a jury trial on the issue of paternity after blood tests have been obtained which indicate a presumption of paternity greater than ninety-five percent (95%), the court may, in its discretion, in lieu of an indemnity bond, order a defendant to pay child support to the clerk of the court to be held in escrow pending final adjudication.
 (e) If the court elects to issue a civil summons for the appearance of a defendant in a paternity action as authorized by § 36-2-103(e), the court, in its discretion, may also take from such a defendant an appearance bond or an appearance and indemnity bond as authorized by this section for defendants brought before the court by arrest warrant. If the court elects to require a bond from a defendant civilly summoned, it shall be subject to the same terms and conditions as the bond otherwise required by this section. The court may also require a defendant brought before the court by summons to, in lieu of an indemnity bond, pay an amount to the court clerk to be held in escrow as authorized by subsection (d).
 (f) Regardless of whether a defendant is brought before the court by civil summons or arrest warrant, the court, in its discretion, may determine at any time during the action that the indemnity bond or escrow payment, if one was required, is insufficient and require that an additional bond be taken or that an additional sum be paid to the clerk to be held in escrow. Before requiring such an additional bond or escrow payment, the court shall weigh the probability of the defendant's paternity, the interests and needs of the child and the estimated length of the paternity action.
 
 
 [6]
 TENN.CODE ANN. § 36-5-101(b) provides:
 In addition to the remedies provided in part 5 of this chapter but not as an alternative to those provisions, and if a parent is more than thirty (30) days in arrears, the clerk of the court may, upon written application of the obligee parent, a guardian or custodian of the children, or the department if the child or children are public charges, issue a summons or, in the discretion of the court, an attachment for such parent setting a date for appearance bond of not less than two hundred fifty dollars ($250) and not more than two thousand five hundred dollars ($2,500). In addition, the court may at any time require an obligor parent to give security by bond with sufficient sureties approved by the court for payment of past, present, and future support due under the order of support. If the obligor parent thereafter fails to appear or fails without good cause to comply with the order of support, such bonds may be forfeited and the proceeds therefrom paid to the court clerk and applied to the order of support.
 
 
 [7]
 TENN.CODE ANN. § 36-5-405 provides:
 (a) Any person seeking to set, enforce, modify or terminate support may commence such an action by filing a petition and testimony in the form prescribed by § 36-5-406 with the office of the clerk.
 (b) When a petition is filed, the clerk shall designate a hearing date on the notice prescribed in this part or, in the alternative, shall designate a hearing date on the summons to be served by the sheriff if the petitioner elects to proceed by having the sheriff serve process to initiate this proceedings. The hearing date shall be within thirty (30) days of the date the petition is filed. If process is served by certified mail, the clerk shall then send a copy of the completed petition, testimony, and notice to respondent by certified mail, return receipt requested. The clerk shall give a copy of completed notice, petition, and testimony to petitioner.
 (c) If the return receipt is not received by the hearing date, and the respondent fails to appear, then the referee shall direct the clerk to reissue the petition with a new notice of hearing and may direct service as set out in subsection (b) or may direct service by issuance of a summons to be served by the sheriff or process service, designated by the referee. If a petition is for contempt, the court may issue an attachment for the arrest of the respondent with a bond.
 (d) If the respondent fails to appear after service and if the return receipt does bear the signature of respondent, the referee may grant the relief sought in the petition by default. If the petition is for contempt, the court may issue an attachment for the arrest for the respondent with a bond.
 (e) If respondent does appear, the referee may enter a consent order if the parties reach [an] agreement and the referee finds the agreement to be reasonable.
 (f) If the respondent appears and the parties do not agree, the referee shall hear testimony and issue an order granting such relief as [the] court referee finds appropriate.
 (g) Upon the conclusion of the hearing in each case, the referee shall transmit to the judge all papers relating to the case, along with [the referee's] findings and recommendations in writing. A referee's decision on a preliminary matter, not dispositive of the ultimate issue in the case, shall be final and not reviewable by the judge.
 ....
 
 
 [8]
 See TENN.CODE ANN. § 36-5-403, which provides for final orders of a referee to be reviewed by a judge
 
 
 [9]
 Specifically, Hill relies on the following portion of the consent decree which reads:
 
 
 [4]
 In criminal non-support proceedings, judicial officers of the Memphis and Shelby County Juvenile Court shall issue arrest warrants only after a finding of probable cause as required by law. Any judicial officer having heard probable cause and issuing such warrant shall recuse himself or herself from presiding at the trial on the merits
 
 
 [10]
 Although the district court's various opinions do not make it at all clear, the court apparently lumped defendants Craig and Moore, employees but not referees of the juvenile court, in with the referees in ruling on the summary judgment motions. In the court's order of December 1, 1993, granting summary judgment to Shelby County, the court states that summary judgment to the referees had been granted by previous order, and in footnote 2, notes, "Thus, Herbert Lane, Veronica Coleman, Harold Horne, Virginia Skinner, Michael H. Craig, and William Moore have been dismissed from the above-styled cases." We note that Virginia Skinner, a sheriff's deputy, was named as a defendant only by plaintiff Luellen and only in his initial complaint. By the time of this summary judgment order, Luellen had amended his complaint and Skinner was no longer a named defendant
 
 
 [11]
 It is not clear whether plaintiffs contest the district court's finding that defendants Coleman, Horne, Lane, Craig, and Moore are entitled to judicial immunity from suit for money damages because they did not engage in non-judicial acts. Nonetheless, the record contains no evidence that any of the individual defendants performed non-judicial acts
 
 
 [12]
 The defendant in Sevier was the same Judge Kenneth Turner, who is the defendant in the instant case
 
 
 [13]
 See FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 230-231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990) ("Although neither side raises the issue here, we are required to address the issue even if the courts below have not passed on it ... and even if the parties fail to raise the issue before us. The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of the jurisdictional doctrines.' ") (internal citations omitted) (citing Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848-49, 23 L.Ed.2d 404 (1969) and quoting Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)); see also United Liberty Life Ins. Co. v. Ryan, 985 F.2d 1320, 1325 (6th Cir.1993) ("This court's threshold duty in every case is to determine whether it has subject matter jurisdiction over the controversy before it, whether or not the parties have preserved for appeal a challenge to the court's jurisdiction.") (citing In re Wolverine Radio Co., 930 F.2d 1132, 1137-38 (6th Cir.1991))
 
 
 [14]
 The rule in federal cases is that a live case or controversy must exist at all stages of review and not merely at the time that the initial complaint is filed. Steffel v. Thompson, 415 U.S. 452, 459 n. 10, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974)